# United States Court of Appeals
## For the First Circuit

No. 16-2089

UNITED STATES OF AMERICA,

Appellee,

v.

JEFFRI DÁVILA-REYES,

Defendant, Appellant.

No. 16-2143

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ D. REYES-VALDIVIA,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

Thomas F. Klumper, Assistant United States Attorney, with

whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and John A. Mathews II, Assistant United States Attorney, were on brief, for appellee.

Franco L. Pérez-Redondo, Research and Writing Specialist, with whom Eric Alexander Vos, Federal Public Defender, Vivianne M. Marrero, Assistant Federal Public Defender, and Liza L. Rosado-Rodríguez, Research and Writing Specialist, were on brief, for appellant Jose D. Reyes-Valdivia.

Raymond L. Sánchez-Maceira on brief for appellant Jeffri Dávila-Reyes.

September 3, 2019

**LIPEZ**, **Circuit Judge**. These consolidated appeals arise from the U.S. Coast Guard's interdiction of a small speed boat in the western Caribbean Sea and the subsequent arrest and indictment of the three men on board the boat for drug trafficking under the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501-70508. In a motion to dismiss the indictment, appellants José Reyes-Valdivia and Jeffri Dávila-Reyes challenged the constitutionality of the MDLEA. They argued that the statute, which in certain circumstances allows U.S. law enforcement to arrest foreign nationals for drug crimes committed in international waters, exceeds Congress's authority under Article I of the Constitution and violates the Due Process Clause. The district court denied the motion to dismiss. Both appellants then pleaded guilty pursuant to plea agreements in which each waived his right to appeal if sentenced in accordance with his agreement's sentencing recommendation provision.

On appeal, appellants renew their constitutional objections to their prosecution. However, their primary argument -- that their vessel was not properly deemed stateless -- founders on our governing precedent concerning the protective principle of international law. That principle, as applied by our court, permits prosecution under the MDLEA even of foreigners on foreign vessels. That precedent may only be reconsidered by the en banc court. We as a panel may not do so. Hence, we affirm both

appellants' convictions. Reyes-Valdivia also asserts sentencing error, but we find no abuse of discretion in the sentence imposed.

**I.**

We draw the following facts from appellants' change of plea colloquies and the uncontested portions of their Presentence Investigation Reports ("PSRs"). See United States v. Vélez-Luciano, 814 F.3d 553, 556 (1st Cir. 2016). While patrolling waters approximately 30 nautical miles southeast of San Andrés Island, Colombia,[1] U.S. Coast Guard officers observed a small vessel moving at a high rate of speed. When the occupants of the vessel became aware of the Coast Guard boat nearby, they began throwing packages and fuel barrels overboard. The Coast Guard officers approached the boat and began to question its occupants, the two appellants and a third co-defendant. The "master"[2] of the vessel "claimed Costa Rican nationality for the vessel," but did not provide any documentation of Costa Rican registry. The Coast Guard then contacted the government of Costa Rica, which neither confirmed nor denied the registry of the vessel. The Coast Guard

---

[1] San Andrés Island, although part of Colombia, is located off the coast of Nicaragua.

[2] The term "master" is synonymous with "captain." It is a legal term of art meaning "he [or she] to whom are committed the government, care, and direction of the vessel and cargo." Kennerson v. Jane R., Inc., 274 F. Supp. 28, 30 (S.D. Tex. 1967). The government did not specify which of the three men the Coast Guard identified as the "master" of the vessel.

officers thus determined that, pursuant to § 70502(d)(1)(C) of the MDLEA,[3] the boat was "without nationality" and subject to U.S. jurisdiction, and they proceeded to board and search it. The officers did not find any contraband, but a chemical test found traces of cocaine. Based on that evidence, the Coast Guard detained the three men -- all citizens of Costa Rica -- and took them to the U.S. Naval Base at Guantánamo Bay, Cuba, and then eventually to Puerto Rico.

All three defendants were charged with two counts of trafficking cocaine in violation of the MDLEA. Reyes-Valdivia and Dávila-Reyes moved to dismiss the indictment for lack of jurisdiction, arguing that the MDLEA, particularly § 70502(d)(1)(C), is unconstitutional. In their view, § 70502(d)(1)(C) exceeds Congress's authority under Article I of the Constitution, and it violates the Due Process Clause of the Fifth Amendment because it is unconstitutionally vague, subject to arbitrary enforcement, and criminalizes conduct that has no nexus with the United States. The district court denied the motion.

Reyes-Valdivia and Dávila-Reyes both subsequently agreed to plead guilty to one count of possession with intent to

---

[3] This provision defines a "vessel without nationality" as one "aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(C).

distribute five or more kilograms of cocaine in violation of the MDLEA. See 46 U.S.C. § 70503(a)(1).[4] The plea agreements for both men calculated a total offense level of 27, based on a base offense level of 30 and a three-level deduction for acceptance of responsibility. See U.S.S.G. §§ 2D1.1(a); 3E1.1(a)-(b). The parties' recommended sentences depended on the court's eventual finding of the Criminal History Category ("CHC"), with the statutory minimum of 120 months' imprisonment to be recommended unless the court found CHC VI (the highest level) applicable. In a supplement to Reyes-Valdivia's plea agreement, the parties agreed to recommend a 57-month term if he qualified for the "safety valve" exception to the mandatory minimum. See 18 U.S.C. § 3553(f)(1)-(5); U.S.S.G. § 5C1.2.[5] Both men agreed to waive appellate review if sentenced in accordance with the sentencing recommendation provisions.

The PSRs calculated the total base offense levels consistently with the plea agreements and assigned Reyes-Valdivia

[4] The third defendant also pleaded guilty to this count and was sentenced to a 57-month term of imprisonment. He did not file an appeal.

[5] Section 3553(f) allows a court to disregard the mandatory minimum sentence for certain drug offenses when the defendant has met specified requirements, including having a limited criminal history and truthfully providing the government with all information about the offense.

a CHC of I and Dávila-Reyes a CHC of III, triggering the 120-month recommendation or, for Reyes-Valdivia, a 57-month term if he were found eligible for the safety valve. However, Reyes-Valdivia's PSR also concluded that he should be given a two-level enhancement for being the "captain" of the vessel. See U.S.S.G. § 2D1.1(b)(3)(C). After Reyes-Valdivia informally objected to the enhancement, the Probation Officer filed an addendum to the PSR stating that Reyes-Valdivia had told federal agents upon his arrival in Puerto Rico that he was the vessel's captain. Reyes-Valdivia then filed a written objection to the PSR in which he argued, inter alia, that the captain enhancement was inapplicable because he did not possess the "specialized skills" it required.

Consistent with the plea agreements, the parties jointly recommended a sentence of 120 months for Dávila-Reyes and a sentence of 57 months for Reyes-Valdivia. The court sentenced Dávila-Reyes to 120 months, but sentenced Reyes-Valdivia to 70 months based on its finding that both the safety valve and the captain enhancement applied. Reyes-Valdivia's motion for reconsideration was denied. Both Reyes-Valdivia and Dávila-Reyes then appealed.

## II.

The government contends that Reyes-Valdivia and Dávila-Reyes each waived his right to appeal in two distinct ways: by the express appellate waiver provisions in their plea agreements and

by entry of unconditional guilty pleas to drug trafficking in violation of the MDLEA. With respect to Reyes-Valdivia, the government is wrong in arguing that he is barred by his plea agreement. As described above, the district court declined to follow the parties' recommended term of 57 months and instead sentenced him to a 70-month term of imprisonment. Because Reyes-Valdivia's sentence exceeded the recommendation, the waiver provision plainly does not apply.[6]

Dávila-Reyes, however, received a 120-month sentence that aligns with the recommendation in his plea agreement. He argues that, despite the enforceable waiver, we should exercise our inherent authority to consider his claims to avoid "a miscarriage of justice." United States v. Teeter, 257 F.3d 14, 25-26 (1st Cir. 2001). He contends that his appeal raises "important questions of law and [of] first impression" -- including the constitutionality of § 70502(d)(1)(C) of the MDLEA -- and that preventing him from presenting that challenge would be unjust.

We agree that the constitutional issues Dávila-Reyes raises are significant and that the other factors allowing us to

[6] The government contends that Reyes-Valdivia is nonetheless bound by the waiver provision because he failed to explain in his opening brief why it is inapplicable. However, it is apparent on the face of the plea agreement that Reyes-Valdivia was not sentenced in accordance with the sentencing recommendation provision, and he was not obligated to make that obvious point in his opening brief. See United States v. Colón-Rosario, 921 F.3d 306, 310-11 (1st Cir. 2019).

exercise our discretion to disregard the appellate waiver also are present to the necessary degree. See, e.g., United States v. Ortiz-Vega, 860 F.3d 20, 27-28 (1st Cir. 2017). Particularly important is the lack of prejudice to the government, given Reyes-Valdivia's presentation of the same issues as Dávila-Reyes. See id. at 27. Indeed, if appellants request and obtain en banc reconsideration of the precedent that currently forecloses their constitutional claims, see infra, the potential for relief should not depend on the happenstance that the district court added an enhancement to Reyes-Valdivia's sentence. Thus, we exercise our discretion to decline to enforce Dávila-Reyes's appellate waiver.

Nor do appellants' guilty pleas foreclose their right to challenge the constitutionality of the MDLEA. The Supreme Court recently held in Class v. United States that "a guilty plea by itself" does not bar "a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal." 138 S. Ct. 798, 803 (2018). In their briefing and oral argument, appellants present claims that are permissible under Class. Although they conceded through their guilty pleas that the MDLEA, by its terms, allows the government to prosecute them under U.S. law, they argue that Congress lacked authority to enact the applicable provisions. In other words, appellants accepted that their convictions were "proper" under the statute, but nonetheless unconstitutional. Such claims may proceed notwithstanding an

unconditional guilty plea. See United States v. Aybar-Ulloa, 913 F.3d 47, 51 (1st Cir. 2019), petition for reh'g en banc filed, No. 15-2377 (Jan. 23, 2019); cf. United States v. Miranda, 780 F.3d 1185, 1194 (D.C. Cir. 2015) (noting that Congress would want the "'[j]urisdiction of the United States with respect to a vessel,' [46] U.S.C. § 70504(a), to be insulated from waiver or forfeiture by a defendant" because "[t]he requirement aims to protect the interests of foreign nations, not merely the interests of the defendant").

**III.**

Appellants' primary constitutional challenge targets a section of the MDLEA that allows U.S. authorities to deem a vessel "without nationality" -- i.e., "stateless" -- when certain conditions are met. See 46 U.S.C. § 70502(d)(1). It is undisputed in this case that the "vessel without nationality" provision of the MDLEA was enacted pursuant to Congress's authority to "define and punish . . . Felonies committed on the high Seas" ("the Felonies Clause"). U.S. Const. art. I, § 8, cl. 10; see United States v. Cruickshank, 837 F.3d 1182, 1187 (11th Cir. 2016) (stating that the MDLEA "was enacted under Congress's authority provided by the Felonies Clause"); United States v. Matos-Luchi, 627 F.3d 1, 3 (1st Cir. 2010) (stating that, in criminalizing drug trafficking in the MDLEA, Congress was "[i]nvoking its constitutional power" under the Felonies Clause). Appellants

argue that Congress's authority under the Felonies Clause is limited by the principles of international law, and they maintain that, under that law, their vessel cannot be deemed stateless. Specifically, they contend that the definition of a stateless vessel relied upon by the government to support jurisdiction over their boat improperly disregards a master's verbal claim of nationality or registry based on mere inaction by the named country, i.e., its failure to confirm or deny "that the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(C). Thus, they say, their arrests and prosecution were unconstitutional.

Under our caselaw, however, appellants' prosecution does not depend on their vessel having been properly deemed stateless. Even if their challenge to the MDLEA's statelessness definition were successful, appellants would still confront our precedent holding that the MDLEA is consistent with the "protective principle" of international law, which permits a nation "to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security." United States v. Cardales, 168 F.3d 548, 553 (1st Cir. 1999) (quoting United States v. Robinson, 843 F.2d 1, 3 (1st Cir. 1988) (Breyer, J.)).

In Cardales, we stated that the protective principle may be triggered in cases brought under the MDLEA "because Congress has determined that all drug trafficking aboard vessels threatens our nation's security." Id. (emphasis added). In so concluding,

we relied on a provision of the MDLEA stating, in pertinent part: "Congress finds and declares that [] trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501. Our court, albeit in mostly split panels, has subsequently accepted as governing precedent the view expressed in Cardales that the protective principle can be applied to drug trafficking in violation of the MDLEA. See, e.g., Aybar-Ulloa, 913 F.3d at 56 (majority opinion); United States v. Vilches-Navarrete, 523 F.3d 1, 21-22 (1st Cir. 2008) (separate opinion of Lynch and Howard, JJ.); United States v. Bravo, 489 F.3d 1, 7-8 (1st Cir. 2007); but see, e.g., Aybar-Ulloa, 913 F.3d at 58-59 (Torruella, J., joining in part and dissenting in part).[7]

Significantly for the case before us, Cardales invoked the protective principle with respect to foreigners on a foreign vessel, initially spotted about 150 miles south of Puerto Rico. See 168 F.3d at 551. The captain of the boat, which was boarded by Coast Guard officers over the captain's objection, claimed it

---

[7] Although our court discussed the protective principle at some length in Robinson, we ultimately sidestepped questions surrounding the principle's scope because the vessel's flag nation had consented to U.S. jurisdiction. See 843 F.2d at 3-4. We recognized in Robinson, however, that "any assertion of jurisdiction under the protective principle must be 'reasonable.'" Id. at 3 (citing Restatement (Revised) § 403; Brown, "Protective Jurisdiction," 34 Am. J. Int'l L. 112, 114 (1940)).

was a Venezuelan vessel. Id. at 551-52. The Venezuelan government later confirmed that the vessel was registered there, and it authorized U.S. intervention. Id. at 552.

Although Venezuela's consent played a large role in the panel's rejection of the defendants' due process challenge to their prosecution, which was based on the lack of a nexus between their criminal conduct and the United States, see id. at 552-53, consent appeared to play no role in the panel's brief discussion of the protective principle as an alternative rationale for upholding U.S. jurisdiction over the defendants, see id. at 553. In a single paragraph, the panel described the principle and noted that Congress's specific finding of a security threat to the United States in § 70501 was "[c]onsistent with this principle." Id. As we observed in Aybar-Ulloa, "[t]here is no indication in this aspect of Cardales's reasoning that its broad assertion regarding the United States' entitlement to assert protective jurisdiction, under international law, was limited only to cases in which the flag nation has consented to the United States' assertion of jurisdiction over a vessel and those on board it." 913 F.3d at 56. Rather, the Cardales panel seemingly treated the congressional declaration of a security threat as adequate on its own to support

protective jurisdiction over the vessel under international law. See id.[8]

Accordingly, even if appellants' vessel possessed Costa Rican nationality, as they claim, appellants would nonetheless be subject to U.S. jurisdiction under our circuit's view of the protective principle. See Vilches-Navarrete, 523 F.3d at 5 (Honduran flagged vessel); Cardales, 168 F.3d at 552 (Venezuelan registry). Notwithstanding Cardales and the cases reiterating its approach, appellants urge us to reject the protective principle as a proper basis for U.S. jurisdiction over their vessel. That entreaty, however, can only be made to the en banc court. Based on our precedent, we must affirm appellants' convictions.

**IV.**

Reyes-Valdivia claims the district court committed procedural sentencing error when it applied a two-level enhancement based on his being the "captain" of the vessel. See U.S.S.G. § 2D1.1(b)(3)(C) (requiring a two-level enhancement if the defendant acted, inter alia, as a "pilot, copilot, captain, [or] navigator . . . aboard any craft or vessel carrying a

---

[8] In a footnote, the Cardales panel observed that "[t]o the extent that international law requires a nexus to the United States, that nexus requirement is not overridden by the MDLEA, but instead is satisfied by the foreign flag nation's authorization to apply U.S. law to the defendants and by the congressional finding that drug trafficking aboard vessels threatens the security of the United States." 168 F.3d at 553 n.2 (emphasis added).

controlled substance"). He acknowledges that he stated at the time of his arrest that he was the captain, but he asserts that the evidence in fact shows that he shared the duties of steering the vessel with others. Reyes-Valdivia highlights the government's view, expressed at the sentencing hearing, that the enhancement should not apply "[g]iven the nature of the ship, and the fact that a captain of one of these boats could be one person one minute and, literally, another person the other minute."

We review a district court's interpretation and application of a sentencing enhancement de novo. See United States v. Trinidad, 839 F.3d 112, 114 (1st Cir. 2016). The court's underlying factual findings may be undone only if clearly erroneous, id., and its judgment calls must be upheld absent an abuse of discretion, United States v. Coleman, 854 F.3d 81, 85 (1st Cir. 2017).

The transcript of the sentencing hearing makes plain that the district court understood the facts that prompted the government to conclude that the captain enhancement was unwarranted. The court acknowledged that Reyes-Valdivia may not have been the master of the vessel, and that he may have said he was the captain only to protect Dávila-Reyes (his cousin) from exposure to more severe punishment resulting from Dávila-Reyes's prior criminal activity. Nonetheless, Reyes-Valdivia not only reported being the captain, but, as his counsel noted at the

hearing, he admitted that "he did, in fact, steer along with the other co-[d]efendants in this case." On this record, we cannot conclude that the district court clearly erred in applying the enhancement. See United States v. Cruz-Mendez, 811 F.3d 1172, 1175-76 (9th Cir. 2016) (joining other circuits, including the First Circuit, in construing the pilot/captain enhancement broadly to cover a defendant who shared piloting responsibilities); cf. Trinidad, 839 F.3d at 116 (rejecting defendant's "contention that he did not act as a navigator because he was a subordinate to the other man on the vessel"); United States v. Guerrero, 114 F.3d 332, 346 (1st Cir. 1997) (rejecting defendant's argument that the enhancement "only applies to offense participants in a position of authority or command").

## V.

We do not reach appellants' challenge to the constitutionality of the MDLEA definition of a "vessel without nationality." Under governing First Circuit precedent, the protective principle of international law permitted the United States to arrest and prosecute appellants even if, as they claim, their vessel possessed Costa Rican nationality. Their argument seeking to change that precedent must be presented to the court en banc.

Accordingly, for the reasons given, we affirm the judgments of conviction and Reyes-Valdivia's sentence.

So ordered.

**-Concurring Opinion Follows-**

**LIPEZ**, **Circuit Judge**, **concurring.** I write separately to explain why I believe our circuit's caselaw on the protective principle of international law is flawed and to urge my colleagues to reconsider that precedent en banc. The protective principle, as we have described it, permits prosecutions under the Maritime Drug Law Enforcement Act ("MDLEA") of foreigners on foreign vessels without any affirmative showing that the targeted drug trafficking impacts the United States or its citizens. That expansive reach of the principle far exceeds the traditional depiction of its scope as a proposition of international law. Indeed, such a broad view of U.S. jurisdiction over vessels is at odds with our obligation to respect every nation's authority over its own persons and vessels.

Harmonizing our view of the protective principle with international law would bring to the forefront appellants' challenge to the MDLEA's "vessel without nationality" provision. In other words, if we concluded that the protective principle does not justify application of the MDLEA to drug trafficking carried out by foreigners on foreign vessels, absent a demonstrated nexus between the drug activity and U.S. security interests, we would need to address whether appellants' vessel was one "without nationality." That is so because the government has made no showing of such a nexus. Although I will not delve into the statutory issue here, I think it important to note that appellants

present a forceful argument that Congress exceeded its authority under Article I of the Constitution by expanding the definition of a stateless vessel beyond the bounds of international law. See 46 U.S.C. § 70502(d)(1).

**Discussion**

A close review of the cases in which we have considered the protective principle reveals that our court's approach to the doctrine rests on shaky footing. I describe that precedent below, explaining why its vulnerabilities warrant en banc reconsideration of our application of the principle, under the MDLEA, to drug trafficking aboard vessels in international waters.

**A. The Protective Principle and the MDLEA**

The "protective principle" is a long-recognized concept of international law that permits a nation to punish extraterritorial conduct that poses a risk to its security or other important state interests. See, e.g., United States v. Robinson, 843 F.2d 1, 3 (1st Cir. 1988). The current version of the applicable Restatement provision describes "Jurisdiction Based on the Protective Principle" as follows:

> International law recognizes a state's jurisdiction to prescribe law with respect to certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other fundamental state interests, such as espionage, certain acts of terrorism, murder of government officials, counterfeiting of the state's seal or

> currency, falsification of official documents, perjury before consular officials, and conspiracy to violate immigration or customs laws.

Restatement (Fourth) of Foreign Relations Law of the United States § 412 (2019).

The language of the MDLEA's declaration on drug trafficking, asserting that trafficking of controlled substances aboard vessels "presents a specific threat to the security and societal well-being of the United States," 46 U.S.C. § 70501,[9] tracks the Restatement provision, and it thus suggests a deliberate desire by Congress to bring drug trafficking within the protective principle. Significantly, the security risk as declared by Congress is not expressly limited to drug activity with a demonstrated impact on, or nexus to, the United States. Rather, the broadly worded statement would on its face include within its scope drug trafficking aboard a vessel halfway around the world, without any showing that those drugs were headed toward the United States or would otherwise affect the United States or its citizens. See United States v. Cardales, 168 F.3d 548, 553 (1st Cir. 1999)

[9] Section 70501 states, in pertinent part: "Congress finds and declares that [] trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States."

(noting Congress's finding that "all drug trafficking aboard vessels threatens our nation's security" (emphasis added)).[10]

The other circuits have not taken a uniform stance on whether a direct nexus to the United States must be shown to trigger the protective principle with respect to drug trafficking. Compare, e.g., United States v. Perlaza, 439 F.3d 1149, 1162 (9th Cir. 2006) (rejecting "the notion that [the] 'protective principle' can be applied to 'prohibiting foreigners on foreign ships 500 miles offshore from possessing drugs that . . . might be bound for Canada, South America, or Zanzibar'" (quoting Robinson, 843 F.2d at 3) with United States v. Gonzalez, 776 F.2d 931, 939 (11th Cir. 1985) (stating that "[t]he protective principle does not require that there be proof of an actual or intended effect inside the United States" and concluding that "conduct may be forbidden if it has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems").

The debate over the nexus requirement for drug trafficking in violation of the MDLEA could be framed as a debate over the types of crimes properly within the scope of the

[10] Although we have acknowledged that the assertion of jurisdiction under the protective principle must be reasonable, see Robinson, 843 F.2d at 3, we did not discuss reasonableness in the post-Robinson cases adopting the protective principle and we have not defined the limits of "reasonable" protective principle jurisdiction.

protective principle. A Reporters' Note to the Restatement provision on protective jurisdiction observes that "no constituent element of the offense and no actual or intended effect in the territory of the regulating state need be shown." Restatement (Fourth) of Foreign Relations Law § 412 n.1 (emphasis added). However, the crimes the Restatement specifies in describing the protective principle -- such as counterfeiting, espionage, and perjury before consular officials -- by their nature directly affect state interests wherever they occur. That is, the crimes traditionally associated with the protective principle are those that inherently include a "nexus" with the prosecuting country as an element. That category of crimes is small, and drug trafficking would not naturally fit within it. See id. cmts. a, b (describing the limited scope of the protective principle); Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes, 93 Minn. L. Rev. 1191, 1229 (2009) (noting that the protective principle has been invoked to "allow[] a state to punish extraterritorially 'a limited class of offenses . . . directed against the security of the state or other offenses threatening the integrity of governmental functions'" (quoting Restatement (Third) of Foreign Relations Law § 402 cmt. f (1987)); id. at 1230 ("Commentators stress that the category of protective jurisdiction offenses is

quite small, and none suggest drug smuggling as one of [the offenses within it].").

Recognizing that drug trafficking does not fall within the category of crimes permissibly triggering the protective principle would not prevent the United States from criminalizing some controlled-substance activity aboard vessels outside its territorial jurisdiction. A different principle recognized under international law is arguably a better fit for drug-trafficking crimes, although that doctrine requires that a nexus be shown between the conduct and the prosecuting country. A Restatement provision titled "Jurisdiction Based on Effects" states: "International law recognizes a state's jurisdiction to prescribe law with respect to conduct that has a substantial effect within its territory." Restatement (Fourth) of Foreign Relations Law § 409 (2018). This jurisdictional principle allows nations to reach crimes other than those with a built-in nexus component -- i.e., crimes like counterfeiting and espionage, which fall within the protective principle as traditionally understood -- and would embrace drug trafficking that in fact "presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501.

**B. The Protective Principle: First Circuit Precedent**

**1. United States v. Robinson**

Only once has a panel majority of our court grappled with the international law implications of the protective principle. In that case, Robinson, the Coast Guard stopped a Panamanian ship about 500 nautical miles east of North Carolina, and boarding officers found a substantial quantity of marijuana in a fake fuel tank. 843 F.2d at 2. Writing for the panel, then-Judge Breyer noted that the appellants questioned the United States's justification for prosecuting drug crimes committed by foreigners on foreign vessels who "might be bound for Canada, South America, or Zanzibar." Id. at 3. He described as "forceful" appellants' argument that multiple courts had wrongly used international law principles to conclude that a predecessor statute to the MDLEA permitted such drug prosecutions in the absence of direct impact on the United States. Id.

In raising doubts about such a broad application of the protective principle, Judge Breyer pointed to a then-current provision of the Restatement of Foreign Relations Law that described the principle as "giv[ing] [a] state [the] power to prescribe law protecting itself from actions taken abroad that harm it." Id. (quoting Restatement (Revised) of Foreign Relations Law § 402(3)). The emphasis in that description is Judge Breyer's. He also quoted a comment to the same Restatement that similarly

depicts the "protective principle [as] 'based on the effect . . . [of an offshore] act upon or in a state's territory.'" Id. (quoting § 402(3), cmt. f) (second alteration in Robinson). Again, the emphasis is Judge Breyer's.

Robinson recognized the inherent tension that exists when a nation seeking to prosecute crime on the high seas must reconcile that objective with the bedrock principle of international law that "all nations have an equal and untrammeled right to navigate on the high seas." United States v. Marino-Garcia, 679 F.2d 1373, 1380 (11th Cir. 1982) (citing Convention on the High Seas, art. 2, Apr. 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200); see also id. (noting that "international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas," and that "vessels are normally considered within the exclusive jurisdiction of the country whose flag they fly"). Cognizant of the need to respect the sovereign interests of other nations, Congress has stated its intention "to stay within the boundaries of international law" when criminalizing maritime drug trafficking. United States v. Matos-Luchi, 627 F.3d 1, 11 (1st Cir. 2010) (Lipez, J., dissenting); see also S. Rep. 96-855 (1980), at 2 (reporting that the MDLEA's predecessor legislation, the Marijuana on the High Seas Act, would "give the Justice Department the maximum prosecutorial authority permitted under international law"); 125 Cong. Rec. 20,083 (1979)

(statement of Rep. Paul McCloskey) (explaining, in reference to the same law, that it authorizes prosecution "to the broadest extent possible under international law"). We also have acknowledged that deference to other nations' interests is a component of the MDLEA, observing that "Congress inserted the requirement that a vessel be subject to the jurisdiction of the United States . . . as a matter of diplomatic comity." United States v. Vilches-Navarrete, 523 F.3d 1, 22 (1st Cir. 2008) (separate opinion of Lynch & Howard, JJ.) (citing United States v. Tinoco, 304 F.3d 1088, 1108 (11th Cir. 2002)); cf. Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 1417 (2018) (Gorsuch, J., concurring) ("[W]hen the framers gathered to write the Constitution they included among their chief priorities endowing the national government with sufficient power to ensure the country's compliance with the law of nations.").[11]

The discussion in Robinson was subsequently described by the Ninth Circuit as having "called into question" the

---

[11] To be sure, Congress in enacting the MDLEA apparently sought to expand U.S. jurisdiction over drug trafficking beyond what was contemplated by its predecessor statute, the Marijuana on the High Seas Act. See S. Rep. No. 99-530, at 15 (1986) (observing that "defendants in cases involving foreign or stateless vessel boardings and seizures have been relying heavily on international jurisdictional questions as legal technicalities to escape conviction"). Nonetheless, as described above, Congress has recognized that the United States must adhere to its responsibilities to the international community when prosecuting crimes on the high seas.

"reasonableness of a broad reading of the 'protective principle.'" Perlaza, 439 F.3d at 1162 (citing Robinson, among other cases). The Robinson court ultimately sidestepped the questions surrounding the scope of the principle, however, because it found "another, different, but perfectly adequate basis in international law for the assertion of American jurisdiction." 843 F.2d at 4. The country of the vessel's nationality, Panama, had "agreed to permit the United States to apply its law on her ship," and the panel held that this acquiescence sufficed to support U.S. prosecution of persons on the vessel under U.S. drug laws. Id.

**2. United States v. Cardales**

Despite the questions about the scope of the protective principle raised in Robinson, and without addressing those issues, we held in Cardales that "application of the MDLEA to the defendants is consistent with the protective principle of international law." 168 F.3d at 553. As our panel opinion reports, the court in Cardales based that pronouncement on the congressional finding that drug trafficking aboard vessels "presents a specific threat to the security . . . of the United States," id. at 553 (quoting 46 U.S.C. § 70501), and we have accepted Cardales's view of the protective principle as our governing precedent, see, e.g., United States v. Aybar-Ulloa, 913 F.3d 47, 56 (1st Cir. 2019) (citing Cardales), petition for reh'g

en banc filed, No. 15-2377 (Jan. 23, 2019); Vilches-Navarrete, 523 F.3d at 22 (same) (separate opinion of Lynch & Howard, JJ.).

Whether Cardales deserves such acceptance, however, is debatable. In Cardales, we upheld the defendants' convictions by relying on the foreign government's consent to the application of U.S. law to both the vessel and the vessel's crew. See Cardales, 168 F.3d at 551-52 (describing the consent of Venezuela, the country of registration). Unlike in Robinson, our discussion focused primarily on consent, and we only briefly addressed the protective principle. See id. at 553. We ultimately rejected the defendants' due process challenge to their prosecution under the MDLEA because "due process is satisfied when the foreign nation in which the vessel is registered authorizes the application of United States law to the persons on board the vessel." Id. We further explained:

> When the foreign flag nation consents to the application of United States law, jurisdiction attaches under the statutory requirements of the MDLEA without violation of due process or the principles of international law because the flag nation's consent eliminates any concern that the application of United States law may be arbitrary or fundamentally unfair.

Id. Our one-paragraph consideration of the protective principle was offered as an additional basis for jurisdiction over the vessel's occupants. Id.

The Cardales panel did not consider whether due process required a "domestic nexus requirement" in an MDLEA prosecution, but we concluded that the government need not "prove a nexus between a defendant's criminal conduct and the United States in a prosecution under the MDLEA when the flag nation has consented to the application of United States law to the defendants." Id. at 552-53. In a footnote, the panel observed that, even if international law required a nexus, the requirement was satisfied by Venezuela's consent and by Congress's "finding that drug trafficking aboard vessels threatens the security of the United States." Id. at 553 n.2 (referring to 46 U.S.C. § 70501).

Our extended discussion of the protective principle in Robinson suggests a concern that a broad view of its scope may transgress longstanding "limits [on] law enforcement on [the] high seas." Robinson, 843 F.2d at 3. Against that backdrop, the cursory treatment of the principle in Cardales and the expansive approach adopted there -- applying the principle to cover even foreigners on foreign vessels -- should give us pause.

**3. The Need to Revisit Cardales**

The questions concerning the proper scope of the protective principle that were bypassed in Robinson remain largely unaddressed by our court. Indeed, as the protective principle is depicted by the Restatement, see supra, the principle arguably does not apply to drug trafficking at all. As described above,

drug-trafficking offenses do not resemble the sorts of crimes typically associated with the principle -- and the premise of "a specific threat to the security and societal well-being of the United States," 46 U.S.C. § 70501, is particularly inapt when there is no evidence that the drugs at issue would reach the United States or U.S. citizens. As Judge Torruella has observed, "drugs not destined for United States markets do not fall into the 'limited class of offenses . . . directed at the security of the State,' since that principle 'refers to the safety and integrity of the state apparatus itself (its "government functions" or "state interests"), not its overall physical and moral well-being.'" United States v. Angulo-Hernández, 576 F.3d 59, 61 (1st Cir. 2009) (Torruella, J., dissenting from the denial of en banc review) (quoting Kontorovich, supra, at 1229-31). Nor does it seem adequate, even if the protective principle can justify jurisdiction over foreign individuals involved in drug trafficking on foreign vessels, for Congress simply to invoke the principle with an unsubstantiated "blanket assertion" of a threat. Aybar-Ulloa, 913 F.3d at 58 (Torruella, J., joining in part and dissenting in part) (discussing 46 U.S.C. § 70501).

Moreover, as Judge Torruella has emphasized, to accept the pronouncement in the MDLEA that all drug trafficking poses a security threat to the United States to justify reliance on the protective principle -- without a "substantial showing of a nexus"

-- "would render the protective principle coterminous with the doctrine of universal jurisdiction." Id. at 59. The universal jurisdiction doctrine permits "a nation [to] prosecute certain serious offenses even though they have no nexus to its territory or its nationals, and no impact on its territory or its citizens." United States v. Cardales-Luna, 632 F.3d 731, 740 (1st Cir. 2011) (Torruella, J., dissenting). However, few offenses qualify as universal jurisdiction crimes -- only those considered "so serious and on such a scale that they can justly be regarded as an attack on the international legal order." Kontorovich, supra, at 1224 n.228 (quoting Anne-Marie Slaughter, "Defining the Limits: Universal Jurisdiction and National Courts," in Universal Jurisdiction: National Courts and the Prosecution of Serious Crimes under International Law 178-79 (Stephen Macedo ed., 2004)).

The Restatement of Foreign Relations Law identifies the crimes subject to universal jurisdiction as including "genocide, crimes against humanity, war crimes, certain acts of terrorism, piracy, the slave trade, and torture." Restatement (Fourth) of Foreign Relations Law § 413.[12] According to the Restatement, this

[12] In full, section 413, titled "Universal Jurisdiction," provides:

> International law recognizes a state's jurisdiction to prescribe law with respect to certain offenses of universal concern, such as genocide, crimes against humanity, war crimes, certain acts of terrorism, piracy, the slave trade, and torture, even if no specific

list is limited -- covering only "the most serious offenses about which a consensus has arisen for the existence of universal jurisdiction" -- because universal jurisdiction "departs from the more typical requirement of a specific connection between the state exercising jurisdiction and the person or conduct being regulated." Id. n.1; see also United States v. Bellaizac-Hurtado, 700 F.3d 1245, 1259 (11th Cir. 2012) (Barkett, J., specially concurring) (noting that the theories of jurisdiction other than "universality" "permit nations to exercise jurisdiction over offenses that implicate domestic interests -- that is, offenses that occur within a nation's territory and those that occur outside the territory but have effects within it" (emphasis added)). Our precedent on the MDLEA has identified "[n]o source of customary international law [that] has designated drug trafficking as being subject to universal jurisdiction." Id. at 1260-61.

To be sure, "a global consensus about the negative effects of drug trafficking" has developed over time, Aybar-Ulloa, 913 F.3d at 59 (Torruella, J., joining in part and dissenting in part), and a close examination of international law norms in 2019 may suggest a different sensibility about the protective principle or universal jurisdiction than Judge Breyer intimated in Robinson

connection exists between the state and the persons or conduct being regulated.

in 1988, see 843 F.2d at 3-4. Yet, it also may remain true that, "unlike genocide" -- or crimes against humanity, torture, etc. -- "the international community has addressed drug trafficking at the domestic, instead of international, level." Bellaizac-Hurtado, 700 F.3d at 1256 (Barkett, J., specially concurring).

**Conclusion**

Although appellants' challenge to their prosecution under the MDLEA founders on the First Circuit's current approach to the protective principle, there is a compelling argument that our approach is neither deeply considered nor faithful to the international law foundation on which it must rest. The need for our country to respect the sovereignty of other nations is reason enough to warrant careful reexamination of our precedent. The individual interests of defendants such as Reyes-Valdivia and Dávila-Reyes -- citizens of Costa Rica plausibly claiming Costa Rican nationality for their vessel -- reinforce the importance of revisiting caselaw that may erroneously allow their lengthy imprisonment for violating U.S. law. Hence, if appellants submit a petition for en banc rehearing, I urge my colleagues to grant it without hesitation or delay.